# Commonwealth v. Kim

226

*Rebecca Strubel*, for Commonwealth.
*Richard Q. Hark*, for defendant.

SMYTH, *J.*, October 8, 2013—

## I. Introduction

Defendant has moved to suppress the fruits of a purportedly consensual roadside search of his car by police and statements he made arising from the encounter as taken in violation of his rights to be free from unreasonable search and seizure under the United States and Pennsylvania Constitutions, U.S. Const. amend. IV; Pa. Const. art. I, § 8. (Omnibus Pretrial Mot. paras. 11, 23-26; Suppression Tr. 3-4, Mar. 26, 2013.) Pursuant to the Pennsylvania Rules of Criminal Procedure, Pa.R.Crim.P. 581, the court held a hearing, at which a single police witness testified and counsel orally argued the motion. We ordered the notes of testimony transcribed and took the matter under advisement pending the parties' filing of legal memos (Suppression Tr. 66-69) and also to allow

the defense to review a videotape of the encounter that had been lately identified but could not be played at the hearing for technical reasons (Suppression Tr. 5-6). Having now considered the testimony and the legal arguments made (counsel made no request to reopen the hearing in light of the tape) we issue the following findings of fact and conclusions of law pursuant to Pa.R.Crim.P. 581(I). *Cf. Commonwealth v. Stevenson*, 832 A.2d 1123, 1126 (Pa. Super. Ct. 2003) (finding a post-appeal opinion adequately related the trial court's factual findings and legal conclusions where the court had not entered them on the record under Pa.R.Crim.P. 581(I) following the hearing on suppression (citing *Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa. Super. Ct. 2002) (en banc))). *But cf. Commonwealth v. Millner*, 585 Pa. 237, 251-52 & n.4, 888 A.2d 680, 688-89 & n.4 (2005) (emphasizing the importance of making contemporaneous findings and conclusions on suppression under Pa.R.Crim.P. 581(I) rather than rendering them in an opinion filed after an appeal from the ruling is taken).

## II. Factual Findings

The only witness at the hearing was the officer who encountered defendant and conducted the search. Based on the officer's testimony, the court credited the following facts.

In the wee hours of March 17, 2012, the officer, who had approximately fifteen years' experience in law enforcement, was patrolling his jurisdiction of Montgomery Township, Montgomery County, in its west section, divided from the east by Route 309. (Suppression Tr. 7-9.) The officer was patrolling alone in a police car that was unmarked but fully equipped with light bars. (Suppression Tr. 10.) At about 3:42 A.M., the officer saw

a car stopped at an intersection, across the border with neighboring Upper Gwynedd Township. (Suppression Tr. 9-11.) The intersection had a left-turn lane, a center lane, and a right-turn lane; the car was in the center lane well past the marked stop line, and cocked to the right. (Suppression Tr. 11-12.) The traffic light changed, the car turned right, and the officer turned around and started to follow it. (Suppression Tr. 12.) The officer followed the car a very short distance; the car was doing thirty-five in a forty-five mile-an-hour zone. (Suppression Tr. 12.) The road the car was traveling at that point had two lanes, a straight lane and a right lane marked towards the end as right turn only. (Suppression Tr. 12.) The car went up to the end of the right lane, then turned into the straight lane, proceeded straight through the intersection, and immediately pulled over to the right and stopped on the shoulder of the road. (Suppression Tr. 12-13.) Regardless of any observations of the motorist's driving, the officer did not initiate a traffic stop; rather, the car pulled over on its own. (Suppression Tr. 13, 26, 30, 46, 59-60.)

The officer pulled in behind the vehicle and activated his lights, front and back, so the driver would know it was a police officer and as protection in case anyone would come up from behind. (Suppression Tr. 13.) During the entire encounter that followed, the lights on the officer's car were "rotating." (Suppression Tr. 48:19-49:8.) That meant a dashboard camera was activated and videotaping the interaction as well. (Suppression Tr. 48:22-49:8.)

The officer radioed out that he was about to be out with a vehicle that pulled off to the side of the road, describing the vehicle and giving its tag number. (Suppression Tr. 13.) He then walked up to the vehicle to speak with the driver (defendant), who was alone in the vehicle. (Suppression Tr. 13-14.)

As soon as the officer approached the driver's window defendant said he was lost and handed the officer a cell phone. (Suppression Tr. 14-15.) Defendant indicated his girlfriend was on the other end of the line, and the officer obligingly took the phone and spoke to her. (Suppression Tr. 15.) She gave her location at a 7-Eleven, and the officer told her he would give defendant directions to get to her when his business with the officer was concluded. (Suppression Tr. 12.)

The officer asked defendant for his driver's license and vehicular registration, which defendant provided. (Suppression Tr. 15.) The officer then asked where defendant was coming from, and he said Philadelphia. (Suppression Tr. 16.) The officer asked defendant "if he has been to Lansdale since his girlfriend obviously is in Lansdale." (Suppression Tr. 16:4-6.) Defendant said he had been to Lansdale before, so the officer asked him how do you get to Lansdale from Philadelphia, and defendant said 309. (Suppression Tr. 16:7-10.) The officer testified, "I just believed that based on — that his girlfriend lives in Lansdale, he is lost, does not know where he got to, why he was coming out of Upper Gwynedd, I felt that would be somewhat suspicious." (Suppression Tr. 16:12-16.)

The officer went back to his patrol car "to do a license check and prior contact." (Suppression Tr. 16:9-10.) "One is for the driver status, to make sure the actual driver's license is valid[,] and also NCIC, to see if there'[re] any warrants for the operator of the vehicle." (Suppression Tr. 17:11-14.) Upon running the check, the officer found that "the registration checked out current valid but the driver's license came back being suspended" (Suppression Tr. 17:17-19) with a note from PennDOT indicating to the officer that he should seize the license. (Suppression Tr. 16:24-17:6.) The check did not show why the license was

suspended. (Suppression Tr. 17:20-21.) The officer wrote a citation for driving while license is suspended and "also did a license forfeiture form so I could send the license back to PennDOT." (Suppression Tr. 17:23-18:2.)

The officer testified that about fifteen minutes elapsed from when he pulled in behind defendant's vehicle "from then going back to my car[,] writing the citation, writing the vehicle seizure [sic] form, and running the NCIC check and license check." (Suppression Tr. 19:19- 20:6.) Meanwhile, about four minutes after the initial radio call, another officer had arrived as backup, which was normal protocol, "especially at night." (Suppression Tr. 20:7-15.) The first officer "didn't request another officer; but normally if we make a traffic stop, there's another car close by, another officer will come just to check, to make sure everything is safe and there's no problem." (Suppression Tr. 20:15-19.) The second officer had parked his car behind the first officer's and was standing to the right along the curb. (Suppression Tr. 20:20-24.) The lights on the second officer's car were rotating as well, "I believe." (Suppression Tr. 48:19-21.)

Upon completing the paperwork, the officer asked defendant "to step back to the car so I could explain the documents that I had to provide him." (Suppression Tr. 18:3-7.) The officer asked defendant if he knew why his license was suspended and defendant said he believed he had unpaid fines. (Suppression Tr. 18:8-14.) The officer "told [defendant] that he would be able to get his license corrected if he [pled] not guilty and he showed me that his license would be reinstated [and] I would withdraw that citation." (Suppression Tr. 18:14-17.)

I also gave [defendant] the document of the license forfeiture explaining to him that I have to take his

license; but with this document, he should go to a photo center with that document, at least for the meantime to have that document, Pennsylvania State identification card made, and he would not be able to get his license until the suspension was lifted.

(Suppression Tr. 18:18-25.)

As the officer made this explanation, defendant was standing behind his car with "nothing impeding him from . . . the driver's door of his car." (Suppression Tr. 19:2-7.) According to the officer, as soon as he finished explaining everything to defendant he was "free to go." (Suppression Tr. 19:8-10.) However, in response to the question "Was he free to drive that car?" (Suppression Tr. 19:11) the officer stated,

[Defendant] told me that his girlfriend . . . was coming to pick up the car and actually he gave me the phone again so I could speak to [her] to tell her exactly where we were.

Once I told her where we were [I] gave him the phone back, and he was just going to wait for [her] to come pick him up.

(Suppression Tr. 19:12-18.)

After I explained to her where the car was located, where he was located at, she said that she was going to come pick him up and [I] handed the phone back to [defendant]. I told him he was free to go. Obviously he had a ride coming. He was not intending to drive anywhere. After that, our time was pretty — we were finished. I started walking back to my car.

(Suppression Tr. 21:5-12.) As the officer did so,

[Defendant] engaged me again in conversation. He asked me again what he is supposed to do with the license[-] seizure form, which I clearly explained two minutes before. So, again, I explained what he needed to do with the license[-]seizure form, about getting a state I.D. for — since his license was being taken.

....

After that, again, he was satisfied with that, and he sort of walked back to his car and I started walking back towards my car.

....

After that, I asked [defendant] if I could ask him a question. He turned around and came back to me. And he said, yes, I can — he would answer my questions.

At that point, I kind of made a statement. I said, we have problems with people bringing things out of Philadelphia that they should not have. Then I asked [defendant] if he had anything that would concern me.

[Defendant] at that point basically patted himself down from top to bottom, starting here, down a couple of — you know, down to his legs. After he did that, he placed his hands on the sides of his car, spread his legs with the intent of me to search. And he said to me, you can search me.

So I went and I patted [defendant] down. I did not search him. It was a pat down. When I was done with that, I said — I asked him, can I search your car?

And he said, yes.

At that point, I searched the car.

(Suppression Tr. 21:15-22:25.)

The officer did not obtain any sort of written consent. (Suppression Tr. 23:2-3.) He described defendant's demeanor in giving consent as "[a]greeable." (Suppression Tr. 23:4-18.)

He — without any kind of probing, he offered me to search him by placing his hands on the side of the vehicle.

Before I asked him anything — about anything other than do you have anything that would concern me, he automatically put his hands — after he pats him down, put his hands on the side of the vehicle and states, I can search him.

(Suppression Tr. 23:18-24:2.) The officer did not testify that he advised defendant he could decline to consent to a search of his car.

The officer's weapon was not drawn during the interaction. (Suppression Tr. 24:3-5.) This was because the officer had no safety concerns. (Suppression Tr. 32:2-4.)

The officer searched first in the compartment of the vehicle, then moved into the trunk. (Suppression Tr. 24:10-14.) There, he "discovered drug evidence." (Suppression Tr. 24:14-15.) Approximately twenty-five minutes had elapsed from the initial stop till when the evidence was found. (Suppression Tr. 24-25.)

On cross-examination, the officer testified that he did not pull defendant over for any traffic violation or other reason. (Suppression Tr. 26:14-15, 30:11-14.) Part of the officer's patrol was to look for things like drunk driving, and he testified that he might be a little more heightened to

such things especially on a weekend at that time of night. (Suppression Tr. 26-27.) However, the officer observed no signs of defendant's being drunk, smelled no alcohol, and sensed no issue of intoxication. (Suppression Tr. 28:5-9, 44:21-45:15.) There were no indicia of intoxication or being under the influence of drugs. (Suppression Tr. 31:5-11.) The officer smelled no burnt or fresh marijuana. (Suppression Tr. 38:14-17.) Defendant was at all times fully compliant, polite, respectful, and cooperative, he was not fumbling, mumbling, slurring his words, or the like, and the officer had no fear for his safety or suspicion of any illegality from the initial contact based on defendant's demeanor. (Suppression Tr. 33:3-19, 34:8-35:13, 44:21- 45:24.) The officer observed no furtive or suspicious movements by defendant during the encounter. (Suppression Tr. 31:22-25, 33:16-19, 42:2-43:3.) The officer could see plainly with his flashlight inside the front and rear compartments of the vehicle and observed no contraband or narcotics. (Suppression Tr. 31:12-15, 43:4-16.)

The officer admitted it was true that, "Aside from you not believing the story that he is lost, there's no other, quote, suspicious, end quote, activity; agreed?" (Suppression Tr. 33:16-19.) The officer persisted on cross-examination, however, in explaining why he thought defendant's story of being lost in a town where he had been before was suspicious. (Suppression Tr. 28:14-17; 30:15-21, 47:2-12.) The officer indicated further his belief, in response to defense counsel's hypothetical question, "[I]f I have been to Vermont before where you don't know the roads, is that suspicious if I get lost? Yes or no?" (Suppression Tr. 29:22-24) that, "Vermont, yes, that would be — yes, that would be." (Suppression Tr. 29:25-30:2.)

The officer also thought it was a "ruse" (Suppression

Tr. 51:17) that defendant asked again about the I.D. procedures "[a]fter I explained it already plus he already had his ride en route." (Suppression Tr. 50:17-18.) The officer stated, "I believe it was [a ruse]. Like I said, I explained to other people and they have the understanding on the first time." (Suppression Tr. 51:18-20.) "I explained it pretty thoroughly." (Suppression Tr. 49:17.) The officer thought that in asking the procedures to be explained again defendant "was being deceptive." (Suppression Tr. 52:18-20.) We did not gather from the officer's testimony, however, how defendant's inquiry constituted a "ruse," defined as "[a]n action or device intended to mislead or confuse," Webster's II New College Dictionary 993 (3d ed. 2005), since the officer did not say what he thought the inquiry was intended to mislead, confuse, or deceive him about.

The court did not necessarily accept, or even follow, the officer's reasoning as to why defendant's saying he was lost, or especially asking for further explanation of the I.D. procedures, provided objective grounds for the officer to be reasonably suspicious of criminal behavior above and beyond defendant's driving under suspension. However, we mention this aspect of the testimony as support for our finding that, subjectively, the officer was suspicious of further criminal behavior. (*See also* Suppression Tr. 54:14 ("Again, I was suspicious").)

Near the conclusion of the hearing, in an attempt to nail down the basis for the officer's request for consent to search defendant's car, to assist in resolving the legal issues presented, the court asked the officer a brief line of questions of our own. Defense counsel's cross-examination had begun to rehash that the officer's pat-down of defendant's person found nothing suspicious — indeed nothing at all (Suppression Tr. 53-56) when the

court said:

> Let me interject.
>
> You did not find anything at all after you patted him down. Then you asked him if he could — if you could search the car.
>
> Did you ask him to search the car because this is routine procedure, if he could get a voluntary search, a consensual search, or did you have what you believed to be reasonable suspicion at the time that something might be in the car?

(Suppression Tr. 56:5-14.) The officer responded, "reasonable suspicion, Your Honor." (Suppression Tr. 56:15-16.) The court continued, "And what was the basis of that? I know you said this before; but let's just say it again, and we can move on." (Suppression Tr. 56:17-19.) The witness answered,

> Again, where he was — where he was at, where he was coming from. Again, after I completely explained what he needed to do with his license, he re-engages me with that.
>
> Then all I did was ask if there was anything that would concern me and immediately he patted himself down, which I have seen in the past when people are trying to be overly cooperative. He places his hands on the side of the vehicle, you know, to be searched.
>
> ....
>
> I find that unusual.

(Suppression Tr. 56:21-57:9.) We find as a fact, based on the officer's descriptions at the hearing of his suspicions, that at some point during the encounter that night he

formed a determination to search defendant's car.

### III. Question Involved

May a police officer perform a roadside search of a car where: the officer in his cruiser has turned around and followed the car late at night on a suburban road; the car, which appears not to be traveling a consistent route, pulls to the side of the road without being stopped and the officer activates his lights and pulls in behind; the driver, who is alone, says he is lost, gets the officer to speak on the phone with a girlfriend who is in the vicinity, and in response to the officer's questions says he is coming from the city and gives the route he travels to get to that suburban location; a second officer shortly arrives on the scene and exits his car; the first officer upon running a check seizes the motorist's license for being suspended, removes the motorist from the car, looks into the car with a flashlight, issues a citation and paperwork, instructs the motorist about reinstating his privileges and getting a state I.D., and tells the motorist he is free to go pending the girlfriend's arrival to pick him up; then, after the motorist has the officer repeat the license procedures and the two again begin to walk back to their cars, reinitiates conversation by stating there are problems with people bringing things out of the city they shouldn't have and asking the motorist if he has anything that would concern the officer; and, after the motorist offers himself for a pat-down that discloses nothing on his person, seeks and obtains the motorist's permission to search the car based on the officer's finding suspicious 1) the motorist's story of being lost in a town he has visited before; 2) the motorist's asking the officer to repeat the I.D. instructions; and 3) the motorist's offering to be patted down in response to the officer's statements and questioning?

### IV. Legal Conclusions

A. General Principles

On a motion for suppression of evidence alleged to have been obtained in violation of an accused's rights, "The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H); *Commonwealth v. Galendez*, 27 A.3d 1042, 1046 (Pa. Super. Ct. 2011) (en banc). "In all cases, the burden of production is now upon the Commonwealth. *See Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968). The burden of persuasion is there as well." Pa.R.Crim.P. 581 cmt. (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "[*Butler*] establishes a preponderance of the evidence as the standard of proof." Pa.R.Crim.P. 581 cmt. "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some[,] or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. Ct. 2003) (citation omitted), quoted in *Galendez*, 27 A.3d at 1046.

B. Search & Seizure

The American law of search and seizure is embodied in a single sentence in the fourth amendment to the U.S. constitution, which provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; *see also* U.S. Const. amend. XIV, § 2 (providing that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"). The fourth amendment's prohibition on unreasonable searches and seizures applies to brief investigative stops or detentions of persons by the police. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Commonwealth v. Strickler*, 563 Pa. 47, 56, 757 A.2d 884, 888 (2000).

A provision of Pennsylvania's constitution even older than its federal counterpart provides, in similar terms, independent, and at times greater, protections to persons within the Commonwealth:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. 1, § 8. The placement of this protection of individual liberty in the first article of Pennsylvania's seminal constitutional document, which predates the U.S. constitution and Bill of Rights, signifies the importance of the guaranty to the foundation of the Commonwealth. *See Commonwealth v. Matos*, 543 Pa. 449, 455-56, 672 A.2d 769, 772-73 (1996) ("[T]his court [has] thoroughly examined the history of article I, section 8, and noted that this constitutional provision had its origin *prior* to the fourth amendment, in...1776. The court [has] also recognized that the modern version of article I, section 8 has remained untouched for over 200 years, and examined this significance [in finding the provision 'unshakably

linked to a right of privacy in this Commonwealth']." (quoting *Commonwealth v. Edmunds*, 526 Pa. 374, 397, 586 A.2d 887, 898 (1991))); *see also Commonwealth v. Jackson*, 548 Pa. 484, 488, 698 A.2d 571, 573 (1997) ("The protection against unreasonable searches and seizures afforded by the Pennsylvania constitution is broader than that under the federal constitution"); *In re B.C.*, 453 Pa. Super. 294, 308, 683 A.2d 919, 926 (1996) ("Pennsylvania courts, in comparison to federal courts, give greater weight to an individual's privacy interests when balancing the relative importance of privacy against the needs of law enforcement"), *appeal dismissed*, 562 Pa. 204,754 A.2d 665 (2000); *Commonwealth v. Parker*, 422 Pa. Super. 393, 399, 619 A.2d 735, 738 (1993) ("The protections of individual privacy against unreasonable government searches and seizures under article 1, section 8 of the Pennsylvania constitution are more expansive than those afforded under the fourth amendment of the United States constitution. The United States Supreme Court's interpretations of fourth amendment guarantees do not bind this court in reaching conclusions regarding the protections provided under article 1, section 8 of the Pennsylvania Constitution" (citations omitted)); *Commonwealth v. Schaeffer*, 370 Pa. Super. 179, 192, 536 A.2d 354, 360 (1987) (en banc) ("Article I; section 8 of the Pennsylvania Constitution, as consistently interpreted by [the Pennsylvania Supreme Court], *mandates greater need for protection from illegal government conduct offensive to the right of privacy*" (quoting *Commonwealth v. Sell*, 504 Pa. 46, 67, 470 A.2d 457, 468 (1983) (emphasis added))), *aff'd on reh'g by an equally divided court*, 539 Pa. 272, 652 A.2d 294 (1994) (per curiam).

"The protection against unreasonable searches and seizures afforded by the Pennsylvania constitution

is broader than that under the [f]ederal constitution." *Commonwealth v. Jackson*, 548 Pa. 484, 488, 698 A.2d 571, 573 (1997). However, "[i]n determining whether reasonable suspicion exists for a Terry stop, the inquiry is the same under either article 1, section 8 of the Pennsylvania constitution or the fourth amendment of the United States Constitution."

*Stevenson*, 832 A.2d at 1127 (footnote omitted) (quoting *Commonwealth v. McClease*, 750 A.2d 320, 324 (Pa. Super. Ct. 2000)); *see also Commonwealth v. Cartagena*, 63 A.3d 294, 299 n.11 (Pa. Super. Ct. 2013) (en banc), *appeal denied*, 70 A.3d 808 (Pa. 2013). *But see Matos*, 543 Pa. 449, 672 A.2d 769 (rejecting under article I, section 8 the interpretation of the fourth amendment in *California v. Hodari D.*, 499 U.S. 621 (1991), which held that a police chase in which the chased person discarded contraband did not constitute a "seizure"); *see also Jackson*, 548 Pa. at 488, 698 A.2d at 573 ("[B]ecause the protection afforded by the Pennsylvania constitution may never be less than under the federal constitution, and also because Pennsylvania has always followed *Terry* in stop and frisk cases, *see Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969), we *begin* our analysis with the United States Supreme Court's decision in *Terry*...." (emphasis added)); *McClease*, 750 A.2d at 324 ("Accordingly, though some federal precedents guide us in our decision here, they do not compel the result we reach"); *cf. Commonwealth v. Polo*, 563 Pa. 218, 759 A.2d 372 (2000) (finding illegal under Pa. Const. art. I, § 8, without reaching the issue under the fourth amendment, an investigative detention of a bus leading to a "consent" search of a passenger).

"A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Strickler*, 563 Pa.

at 56, 757 A.2d at 888 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)); *Commonwealth v. Mesa*, 453 Pa. Super. 147, 151, 683 A.2d 643, 645 (1996) ("Subject to certain exceptions, warrantless searches are presumed unreasonable [under the constitution]"). "Warrantless searches and seizures are unreasonable *per se*, unless conducted pursuant to a specifically established and well-delineated exception to the warrant requirement." *B.C.*, 453 Pa. Super. at 301, 683 A.2d at 923 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "One such exception is consent, voluntarily given." *Strickler*, 563 Pa. at 56, 757 A.2d at 888 (citing *Schneckloth*, 412 U.S. at 219).

Evidence obtained in violation of a criminal suspect's constitutional rights to be free from unreasonable search and seizure is subject to suppression under the exclusionary rule. "[T]he exclusion of unconstitutionally obtained evidence is not a constitutional *right*, but a constitutional *remedy*. . . ." *Edmunds*, 526 Pa. at 395 n.10, 586 A.2d at 898 n.10 (discussing the relationship between the federal and Pennsylvania constitutional prohibitions on unreasonable search and seizure and rejecting, under Pa. Const. art. I, § 8, the "good-faith" exception to the exclusionary rule adopted by the U.S. Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), under the fourth amendment); *see Commonwealth v. Shaw*, 476 Pa. 543, 555-56, 383 A.2d 496, 502 (1978); *Mesa*, 453 Pa. Super. at 158, 683 A.2d at 649; *see also Polo*, 563 Pa. 218, 759 A.2d 372 (affirming Superior Court's reversal of trial court's order denying suppression of evidence that the Supreme Court specifically found to have been obtained as a result of search and seizure illegal under Pa. Const. art. I, § 8).

C. Investigative Detention

The fourth amendment to the United States constitution and article I, section 8 of the Pennsylvania constitution protect citizens from "unreasonable searches and seizures, including those entailing only a brief detention." To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. For this purpose, our Supreme Court has defined three forms of police-citizen interaction: a mere encounter, an investigatory detention, and a custodial detention. A mere encounter between the police and a citizen during which an officer merely questions the citizen without suggestion of coercion, carries no official compulsion on the part of the citizen to stop or to respond and, consequently, need not be supported by any level of suspicion. If, however, the police presence becomes too intrusive, a mere encounter may be regarded as an investigatory detention or seizure.

*Reppert*, 814 A.2d at 1201 (citations omitted) (quoting *Strickler*, 563 Pa. at 56, 757 A.2d at 888). The Pennsylvania Supreme Court

has noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio* and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional

equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Smith*, 575 Pa. 203, 212-13, 836 A.2d 5, 10 (2003), quoted in *Commonwealth v. Moyer*, 954 A.2d 659, 663 (Pa. Super. Ct. 2008) (en banc) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)); *see also Polo*, 563 Pa. at 224, 759 A.2d at 375; *Stevenson*, 832 A.2d at 1127.

To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. "Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes."

*Reppert*, 814 A.2d at 1201-02 (quoting *Commonwealth v. Beasley*, 761 A.2d 621, 625 (2000) (citing *Matos*, 543 Pa. at 457, 672 A.2d at 773 (citing *Commonwealth v. Jones*, 474 Pa. 364, 373, 378 A.2d 835, 840 (1977))))).

To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is

directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

The *Strickler* Court noted that by its nature, this test is imprecise since it is "designed to assess the coercive effect of police conduct, taken as a whole[,] rather than [to] focus on particular details of that conduct in isolation."

*Moyer*, 954 A.2d at 664-65 (citations omitted) (quoting *Strickler*, 563 Pa. at 58-59 & n.8, 757 A.2d at 889-90 & n.8 (footnotes omitted)).

The "reasonable suspicion" required to justify the show of authority involved in an investigative detention "requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate." *Stevenson*, 832 A.2d at 1127 (citing *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153 (2000)). "To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion...." *Strickler* 563 Pa. at 58, 757 A.2d at 889.

Our Supreme Court has mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. [*See Commonwealth v. Polo*, 563 Pa. 218, 224, 759 A.2d 372, 375 (2000).] The question of

whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a *"particularized and objective basis"* for suspecting the individual stopped. [*Commonwealth v. Ayala*, 791 A.2d 1202, 1209 (Pa. Super. Ct. 2002) (quoting *In re D.M.*,566 Pa. 445, 449, 781 A.2d 1161, 1163 (2001)).] Thus, to establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. [*See Commonwealth v. Cook*, 558 Pa. 50, 57, 735 A.2d 673, 677 (1999) (plurality opinion).]

*Reppert*, 814 A.2d at 1203-04.

Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in "the often competitive enterprise of ferreting out crime." [*In re D.E.M.*, 727 A.2d 570, 578 n.19 (Pa. Super. Ct. 1999) (quoting *Terry*, 392 U.S. at 12).] Therefore, the fundamental inquiry of a reviewing court must be an objective one, "namely, whether 'the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *This inquiry will not be satisfied by an officer's hunch or unparticularized suspicion. [See Commonwealth v. Arch*, 439 Pa. Super. 606, 654 A.2d 1141, 1144 (1995).]

*Reppert*, 814 A.2d at 1204 (quoting *Zhahir*, 561 Pa. at

552, 751 A.2d at 1156 (alteration in original) (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 21-22)); *see also Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. Ct. 2011) ("In order to determine whether the police had reasonable suspicion, the totality of the circumstances-the whole picture-must be considered. 'Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity'" (citation omitted) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981))).

D. Application to Traffic Stops & Searches of Automobiles by Consent

"The *Terry* totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters." *Simmons*, 17 A.3d at 403 (citing *Mesa*, 453 Pa. Super. 147, 683 A.2d 643).

On multiple occasions, our courts have applied this standard in the context of motor vehicle stops during which police have ordered a motorist or his passengers to disembark. [*See Commonwealth v. Freeman*, 563 Pa. 82, 87-90, 757 A.2d 903, 906-07 (2000); *Commonwealth v. Sierra*, 555 Pa. 170, 174-75, 723 A.2d 644, 646 (1999) (plurality opinion); *Commonwealth v. Donaldson*, 786 A.2d 279, 285-86 (Pa. Super. Ct. 2001); *Commonwealth v. Lopez*, 415 Pa. Super. 252, 259-63, 609 A.2d 177, 181-82 (1992); *Commonwealth v. Elliott*, 376 Pa. Super. 536, 547-49, 546 A.2d 654, 660 (1988).] Our Supreme Court has recognized expressly that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety. Once the primary traffic stop has concluded, however, the officer's authority to order either driver or occupant

from the car is extinguished. Thus, if subsequently the officer directs or requests the occupants to exit the vehicle, his show of authority may constitute an investigatory detention subject to a renewed showing of reasonable suspicion. [*See Donaldson*, 786 A.2d at 285 n.4 (concluding that officer's "request" following conclusion of traffic stop that driver exit vehicle could not be viewed as discretionary and therefore constituted investigatory detention).]

*Reppert*, 814 A.2d at 1202 (citations omitted); *see also Parker*, 422 Pa. Super. 393, 619 A.2d 735 (holding that police officer's continued detention of driver stopped for traffic violation, after officer issued traffic citation, constituted seizure and was improper), *cited with approval in Sierra*, 555 Pa. at 176, 723 A.2d at 646 (plurality opinion).

Situations involving a request for consent to search following an initial lawful detention have posed difficult analytical questions for courts, and have been the subject of extensive commentary. Frequently the argument is made in such cases that, although the initial detention may be constitutionally valid, some warning or admonition should be given to ameliorate the coercive aspects of the initial detention and prevent them from infecting the subsequent request for consent. Thus, in the context of a traffic or similar stop, once the purpose for the stop has been completed, the question arises: Does the individual have objective reasons to believe that he is (or is not) free to end the police/citizen encounter?

*Strickler*, 563 Pa. at 60, 757 A.2d at 890-91 (citations omitted).

The central fourth amendment inquiries in consent

cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. Where, however, a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.

*Id.* at 56-57, 757 A.2d at 888-89; *see also Commonwealth v. Cleckley*, 558 Pa. 517, 528, 738 A.2d 427, 433 (1999). "Since both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses." *Strickler*, 563 Pa. at 79, 757 A.2d at 901-02.

In *Moyer*, the Pennsylvania Superior Court en banc reviewed the twin Pennsylvania Supreme Court decisions *Strickler* and *Freeman*, rendered the same day, respectively upholding and rejecting the constitutionality of a "consent" search of an automobile stopped by the roadside. The en banc panel distilled from the high court's decisions the following guidelines and tests for assessing whether a consensual automobile search passed constitutional muster:

The Supreme Court ruled that after an initial valid detention has concluded, the crucial determination of whether a continuing interdiction constitutes a mere

encounter or a constitutional seizure centers upon whether an individual would objectively believe that he was free to end the encounter and refuse a request to answer questions or conduct a search. In making this determination, we must examine the totality of the circumstances surrounding the interaction between the police and the citizen. A non-exclusive list of factors to be used in assessing whether police conducted a mere encounter after completion of a traffic stop includes: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, . . . thus suggesting to a citizen that his movements may remain subject to police restraint, [is a pertinent factor]"; 9) the "presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective [factor";] and 10) whether the citizen has been informed that he is not required to consent to the search.

The court made a critical observation: when an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official detention, is *less likely* to understand that he has the right to refuse to answer questions or a search. Furthermore, while acknowledging the importance of the ninth factor, the court stressed that "conferral of the 'free-to-go' advice

is, itself[,] not a reason to forego a totality assessment" and therefore does not constitute a controlling factor in assessing whether a person would actually credit a police indication that he was free to leave.

*Moyer*, 954 A.2d at 665 (alterations added) (quoting *Strickler*, 563 Pa. at 74-75 & n.24, 757 A.2d at 898-99 & n.24). The Superior Court en banc in *Reppert* applied the same factors in invalidating a search pursuant to a traffic stop, but quoting the *Freeman* formulation of the same basic test:

> The matter of when a traffic stop has concluded or otherwise given way to a new interaction does not lend itself to a "brightline" definition. Thus, in *Freeman*, our Supreme Court defined multiple relevant circumstances on the basis of which we may recognize the end of a traffic stop and the commencement of another interaction. The court enumerated the following circumstances:

> the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example-the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors [sic] stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search.

*Reppert*, 814 A.2d at 1202 (quoting *Freeman*, 563 Pa. at 88-89, 757 A.2d at 906-07).

Moyer applied the *Strickler/Freeman* factors to the roadside "consensual" automobile search conducted in that case, in circumstances bearing a striking resemblance to the case we now confront. The relevant facts, as rendered by the en banc court, were as follows:

> At approximately 11:20 p.m. on June 28, 2005, then-Corporal Jonathan Mays of the Pennsylvania State Police was patrolling on Mill Street in South Middleton Township, Cumberland County. Both he and Trooper Elmer Hertzog were in full uniform in a marked cruiser. Officer Mays observed appellee's vehicle, which had "one tail light" with "a hole in it, and it was exposing white light to the rear, a good amount of white light to the rear." Officer Mays initiated a traffic stop by activating his emergency lights, and appellee pulled his vehicle over to the berm. Since it was night, the police officer positioned a bright spot light from atop the cruiser so as to "light the interior of [appellee's] vehicle" to ensure that he could safely approach it. At that time, Officer Mays observed "a lot of movement between the driver and the passenger, it was all focused down towards the floor boards and toward the passenger side of the vehicle."
>
> When Officer Mays approached appellee's vehicle, he informed appellee about the reason for the stop and requested a driver's license and registration card. After appellee provided the documentation, Officer Mays started inquiring about his destination. Appellee responded that he had come from and was returning to Carlisle, Pennsylvania. When pressed for more details, appellee stated that he had stopped at the Sheetz store in Mount Holly. Since appellee appeared nervous and displayed bloodshot eyes, Officer Mays initiated a search for his criminal history, and that "inquiry

showed that there was a fingerprint at one time for act 64, some kind of encounter with Act 64[, 35 P.S. §§780-101, -113(a)(16), (30)]." Officer Mays discovered that appellee's encounter with that act consisted of an arrest for marijuana possession.

Officer Mays prepared a warning regarding the taillight, returned to the vehicle, ordered appellee to exit the vehicle, and directed him to the rear of the car. Officer Mays showed him the hole in the taillight, told him to repair it, and gave him a warning card. Trooper Hertzog was standing beside Officer Mays at the rear of the car, and both were armed. At that point, appellee was instructed that he was free to leave, but as appellee reached the driver's door of his vehicle, Officer Mays called "his name out" and "asked if he mind[ed]" if the officer asked him a few questions. Officer Mays did not inform appellee that he did not have to answer the questions.

After appellee agreed to respond, Officer Mays revealed that he was aware of appellee's "arrest for act 64 in the past" and had observed the movements in the car after the traffic stop. He then asked appellee if there were any drugs or paraphernalia in the car. After appellee responded negatively, Officer Mays continued questioning appellee as to whether he had any controlled substances or paraphernalia on his person. Appellee denied possessing anything on his person. Then, Officer Mays "asked him if [he] could check his vehicle to make sure that was the case." Appellee, who was not told that he could refuse that request, consented to the search of both his person and his vehicle.

A crack pipe was discovered on appellee's person and another crack pipe was located in the car. Appellee

then admitted to Trooper Hertzog that he had recently smoked crack cocaine. He was arrested and transported to Carlisle Hospital to have his blood drawn, which tested positively for the presence of cocaine. Appellee was given his *Miranda* warnings for the first time at the booking center for his DUI charge.

On August 3, 2005, appellee was charged with one count each of possession of drug paraphernalia and driving under the influence of a controlled substance. Appellee filed an omnibus pretrial motion to suppress all evidence seized as a result of the traffic stop. At the suppression hearing on January 23, 2006, the Commonwealth presented Troopers Mays and Hertzog, who testified to the facts as delineated above.

Appellee, who has an eighth-grade education and left school at the age of sixteen, took the stand and conceded that after Officer Mays returned his documentation, the officer informed him that he was free to leave. Appellee testified, however, that he did not believe he had any choice except to answer questions after Officer Mays re-initiated contact and that he felt similarly compelled to consent to the search of his person and his vehicle.

Based on these facts, the suppression court concluded that appellee had been subjected to an investigatory detention when Officer Mays asked him if he would answer some questions after returning appellee's paperwork. The court credited appellee's testimony that he did not feel free to leave despite Officer Mays's statement to the contrary. The court concluded that appellee's beliefs were objectively reasonable given all of the circumstances surrounding the interdiction, including the late hour, the isolated and dark rural road, and the bright spotlight shining on appellee's car.

The court also considered the fact that appellee had been ordered to exit his car, two armed police officers were outside of their cruiser to speak with appellee, and appellee was subjected to questioning before re-entering his car and immediately after being informed that he was free to leave. Appellee was never told that he was not required to answer the questions, nor was he informed that he did not have to consent to the search. Since the detention was not supported by reasonable suspicion, the trial court suppressed the two crack pipes found as a result of the search of appellee's vehicle and person as well as appellee's confession to the use of crack cocaine and the results of his blood test. This appeal by the Commonwealth ensued.

*Moyer*, 954 A.2d at 661-63 (citations omitted) (footnote omitted).

The en banc court, applying the *Strickler/Freeman* analysis to these facts, found that the defendant's consent to search was invalid and the resulting search was illegal because the officer's reintroducing questioning after returning the defendant's documents and telling him he was free to leave constituted a further investigative detention that was unsupported by reasonable suspicion.

*McLease* is also similar factually. There, the officers, in the course of an investigatory detention, conducted a pat-down search of the defendant after removing him from his automobile, whereupon he volunteered consent to search the car. The Superior Court held that the illegality of the detention invalidated the consent and that the fruits of the car search had to be suppressed.

We now, guided by these decisions, apply the *Strickler/ Freeman* analysis to the facts of the case: The officer's "suspicions" from the outset of his conversation with

defendant that grew throughout the encounter — based first on defendant's saying he was lost in a town he had been to before and then on his asking for a second explanation of the I.D. procedures the officer thought he had "clearly" explained — were not objective, articulable, reasonable suspicion of criminal behavior under the federal and state constitutions. The officer's suspicions heightened the coerciveness of the environment in which defendant, who had been ordered out of his car late at night in the presence of two officers' police cars with flashing lights and had his license seized, was then told by the officer that there was a problem with people bringing things out of the city defendant was from that they shouldn't have and asked whether defendant had anything that should concern the officer. *Cf. Strickler* 563 Pa. at 77 n.26, 757 A.2d at 900 n.26 ("Strickler's suggestion that flashing lights from the nearby police cruiser added to the unsettling effect is not supported in the record. Indeed, to the contrary, the arresting officer testified to his belief that the emergency lights were not activated, or, if they were, only the back-up lights were illuminated, shining only to the rear of the vehicle"). Despite the officer's statement defendant was "free to go," defendant was not, at that moment, free to drive away, and the officer's reinitiating questioning once the initial encounter was concluded constituted an impermissible investigative detention in the absence of reasonable suspicion. *See McLease*, 750 A.2d at 322 ("[N]otwithstanding the absence of evidence to establish a person's intent to leave the scene, a seizure occurs when, under all the surrounding circumstances, a reasonable person would not feel free to leave"); *cf. Commonwealth v. Lyles*, 54 A.3d 76, 84 (Pa. Super. Ct. 2012) (Strassburger, J., concurring, joined by Bender, J.) ("I write separately to point out that the case law has developed into an Alice in Wonderland scenario, as judges attempt to determine if an

individual is or is not free to leave. When a police officer initiates an encounter, an individual as a practical matter *never* feels free to leave. The police officer has a weapon. The police officer's testimony is almost always believed in court. No responsible person would walk away from an encounter with a police officer. Lawyers, judges and law professors can debate the niceties as to whether an individual is legally free to leave, but the case law does not comport with reality"), *appeal granted*, 68 A.3d 323 (Pa. 2013). Thus, when defendant offered himself to be patted down, and then, after a pat-down revealed nothing, responded to the officer's inquiry by "consenting" to a search of his car, the consent was not voluntary under the entirety of the circumstances.

The officer's search of the car in these circumstances was in violation of the constitutional protections against unreasonable searches and seizures under the fourth amendment and Pennsylvania's article I, section 8. We therefore must suppress all fruits of the search from the point of the prohibited investigative detention, that is, from the officer's reinitiating statements to and questioning of defendant after the law-enforcement purpose of the encounter had been served and the encounter concluded.

## V. Summary of Determination Sur Suppression

Because defendant consented to a search of his car in the context of an investigative roadside detention conducted in the absence of reasonable suspicion of criminal behavior, the subsequent search of the car was unconstitutional under the federal and state constitutions. Under the constitutional remedy of the exclusionary rule, we hereby suppress all fruits of the unconstitutional search.