**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Vanderlee STEVENSON, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 2003.
Filed Sept. 16, 2003.

Kenneth J. Haber, Pittsburgh, for appellant.

James R. Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: TODD, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Vanderlee Stevenson, asks us to determine whether the trial court erred in denying his motion to suppress evidence where the police officers conducting an investigatory detention lacked articulable and reasonable suspicion to believe Appellant was engaged in criminal activity. We hold where the police act on an unsubstantiated radio broadcast that a person is engaged in narcotics activity and a mere assumption that the person is currently driving under suspension, based solely on an encounter with that person three years prior, and where the police fail to articulate grounds to support an allegation that the person is unlawfully parked, the police have failed to show the requisite reasonable basis for an investigative detention. Therefore, the investigative detention of Appellant in the instant case was unlawful, and the evidence garnered as a result of that detention should have been suppressed. Accordingly, we vacate Appellant's judgment of sentence and remand for further proceedings consistent with this opinion.

¶ 2 On the evening of February 23, 1999, Officer Green of the Pittsburgh Police observed Appellant driving a red Nissan Altima. Officer Green had a previous encounter with Appellant in 1996, where Appellant did not have a valid driver's license. Based on this previous encounter, Officer Green issued a "Be on the Lookout" ("BOLO") broadcast for Appellant. Officer Green gave Appellant's name, the car's make and model and described Appellant as a black male. Officer Green then lost sight of Appellant. Officer Bonkowski, along with his partner, heard Officer Green's BOLO broadcast, but did not hear Appellant's name. Officer Bonkowski also heard a broadcast from Task Force 42, a plain-clothes narcotics unit. Officer Bonkowski testified Task Force 42 broadcasted that Appellant's vehicle was involved in possible narcotics activity (N.T. Suppression Hearing, 4/28/00, at 23, 57), and that "narcotics" was heard over the radio (*Id.* at 72, 87). No member from Task Force 42 testified at the suppression hearing concerning the basis for the narcotics allegations. Officer Bonkowski and his partner searched the area and observed a car matching Officer Green's description. Appellant had "double parked" his vehicle as he waited for a relative to come outside to go shopping. Officer Bonkowski approached the vehicle, ordered Appellant to roll down his window and to end his cell phone conversation. Officer Bonkowski then asked Appellant for his driver's license. Appellant informed the officer that he did not have a license. Officer Bonkowski told Appellant to get out of the vehicle. Appellant complied and immediately put his hands on the car. Officer Bonkowski testified he observed Appellant's jacket hanging lower on one side and saw an object in the pocket. Officer Bonkowski touched the object with the back of his hand, manipulated the object, and realized it was a gun. Officer Bon-

kowski and his partner took Appellant down to the ground and removed the weapon. As the officer removed the weapon, a bag of marijuana fell out of Appellant's pocket. Officer Green arrived and identified Appellant as the subject of his BOLO broadcast. The officers then searched Appellant and found five more bags of marijuana.

¶ 3 Appellant was charged with two counts of violating the Uniform Firearms Act [1], one count of possessing a controlled substance [2], one count of possessing a controlled substance with intent to deliver [3], driving while under suspension [4] and double parking [5]. The trial court dismissed the charge of possession of a controlled substance with intent to deliver and found Appellant not guilty of double parking. The trial court found Appellant guilty at a bench trial of two counts of violating the Uniform Firearms Act, possession of a controlled substance, and driving under suspension. The court sentenced Appellant to eleven and one half to twenty-three months' incarceration. This timely appeal followed.

¶ 4 Appellant raises one issue for our review on appeal:

WHETHER THE TRIAL COURT ERRED BY RULING THAT THE POLICE OFFICERS POSSESSED THE REQUISITE REASONABLE SUSPICION AT THE TIME THEY APPROACHED AND QUESTIONED APPELLANT, PLACING HIM UNDER INVESTIGATIVE DETENTION, WHEN THE OFFICERS' ACTIONS RESULTED FROM POLICE RADIO BROADCASTS WHICH WERE NOT BASED ON SPECIFIC AND ARTIC-ULABLE FACTS THAT APPELLANT WAS ENGAGED IN CRIMINAL ACTIVITY?

(Appellant's Brief at 5).

■ ¶ 5 As a preliminary matter, we note the trial court failed to enter findings of fact and conclusions of law following the suppression hearing. (*See* Pa.R.Crim.P. 581(I)) (stating trial court must enter on record findings of fact and conclusions of law at end of suppression hearing). Where a trial court fails to abide by Rule 581(I), however, this Court may look at the trial court's Rule 1925(a) opinion to garner findings of fact and conclusions of law. *See Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa.Super.2002). Here, the trial court issued a 1925(a) opinion that adequately relates the court's findings of fact and conclusions of law. Thus, we will review Appellant's issue. *Id.*

¶ 6 We begin by noting:

Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Id.* (internal citations and quotation marks omitted). At the suppression hearing, the onus is on the Commonwealth to "establish by a preponderance of evidence that the

1. 18 Pa.C.S.A. §§ 6101, 6106.

2. 35 P.S. § 780–113(a)(16).

3. 35 P.S. § 780–113(a)(30).

4. 75 Pa.C.S.A. § 1543(b).

5. 75 Pa.C.S.A. § 3353.

challenged evidence is admissible." Pa. R.Crim.P. 581(H). *See also Commonwealth v. Andersen,* 753 A.2d 1289, 1291 (Pa.Super.2000).

¶ 7 There are three types of interactions between police and the citizenry. *See generally Commonwealth v. DeHart,* 745 A.2d 633, 636 (Pa.Super.2000).

> Interaction between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained. Such interaction may be classified as a "mere encounter," an "investigative detention," or a "custodial detention." A "mere encounter" can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

> In contrast, an "investigative detention," by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires "reasonable suspicion" of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id.* at 636 (internal citations and some quotation marks omitted).

¶ 8 "The protection against unreasonable searches and seizures afforded by the Pennsylvania Constitution is broader

than that under the Federal Constitution." *Commonwealth v. Jackson,* 548 Pa. 484, 488, 698 A.2d 571, 573 (1997). However, "[i]n determining whether reasonable suspicion exists for a *Terry* [6] stop, the inquiry is the same under either Article 1, Section 8 of the Pennsylvania Constitution or the Fourth Amendment of the United States Constitution." *Commonwealth v. McClease,* 750 A.2d 320, 324 (Pa.Super.2000).

¶ 9 To determine if an interaction rises to the level of an investigative detention, *i.e.,* a *Terry* stop, the court must examine all the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders. *Commonwealth v. Sierra,* 555 Pa. 170, 175, 723 A.2d 644, 646 (1999). An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. *Commonwealth v. Melendez,* 544 Pa. 323, 331, 676 A.2d 226, 229 (1996). To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. *Sierra, supra* at 176, 723 A.2d at 647. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate. *See Commonwealth v. Zhahir,* 561 Pa. 545, 751 A.2d 1153 (2000).

¶ 10 Our Supreme Court has opined:

> In *Whiteley [v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971)], the Supreme Court concluded that evidence uncovered during a search incident to an arrest upon reliance on a flyer is permis-

---

**6.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20  L.Ed.2d 889 (1968).

sible so long as the officer who issued the flyer possessed probable cause to arrest. It is irrelevant as to whether the arresting officers have the specific facts which led the issuing officer to conclude that probable cause existed so long as the issuing officer has the necessary articulable facts.

Applying the *Whiteley* analysis in [*U.S. v. Hensley*, 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)], the Supreme Court stated:

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification...to pose questions to the person, or to detain the person briefly while attempting to obtain further information.
>
> * * *
>
> If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.
>
> * * *
>
> Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop....

469 U.S. at 232–233, 105 S.Ct. at 682. (citations omitted).

The rationale of *Whiteley* and *Hensley* clearly supports the proposition that a stop and frisk may be supported by a police radio bulletin **only** if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion. To hold otherwise would permit the government to bypass the protections of the Fourth Amendment and Article I, Section 8, of the Pennsylvania Constitution by always having a second police officer summoned for assistance for the purpose of making the inquiry of a suspect on the basis of an initial police officer's suspicion. At no time would the government have to establish any articulable facts, thus completely emasculating the protections against illegal searches and seizures.

*Commonwealth v. Queen,* 536 Pa. 315, 319–20, 639 A.2d 443, 445 (1994) (emphasis in original). The articulable facts underlying the reasonable suspicion for radio bulletins must be established at a suppression hearing to support a stop and frisk. *Id.* This Court has repeatedly held that reasonable suspicion is not satisfied by an officer's hunch or baseless suspicion. *See, e.g., Commonwealth v. Beasley,* 761 A.2d 621, 626 (Pa.Super.2000), *appeal denied,* 565 Pa. 662, 775 A.2d 801 (2001); *Commonwealth v. Donaldson,* 786 A.2d 279, 281 (Pa.Super.2001), *appeal denied,* 569 Pa. 679, 800 A.2d 931 (2002).

¶ 11 In *Andersen, supra,* the police stopped a vehicle whose owner was known to be unlicensed. The officer assumed that the unlicensed owner was the driver, but did not know who was driving the car until he actually stopped the vehicle. *Id.* at 1292. The officer then cited the driver for driving without a license. The trial court refused to suppress the evidence garnered from this stop. *Id.* On appeal, this Court iterated its concern that allowing the police to stop cars owned by persons with suspended licenses, based solely on an officer's observation of the car itself in operation would subject lawful drivers to unwarranted traffic stops. *Id.* at 1294. Noting that the officer did not have articu-

lable and reasonable grounds to believe the operator of the vehicle was violating the motor vehicle code, this Court reversed the trial court and held that the police could not initiate a stop on the assumption that an unlicensed vehicle owner was actually driving his car, without identifying the driver before initiating the stop. *Id.*

¶ 12 In *DeHart, supra,* police officers received an anonymous tip regarding a "suspicious vehicle" that was possibly a blue Camaro or TransAm. *Id.* at 628. Shortly thereafter, the police observed a vehicle matching that description stopped off of the side of the road. *Id.* at 634. From their cruiser, the officers asked the occupants what was going on and, upon receiving an unsatisfactory answer, the officers exited their cruiser and began to question the occupants of the vehicle. *Id.* One of the officers smelled alcohol and asked the passenger to exit the vehicle. The officer conducted a pat down, which revealed marijuana and drug paraphernalia. The trial court granted the passenger's motion to suppress. On appeal, this Court held that the police encounter did not constitute a traffic stop, because the vehicle was already parked when the officers made their initial encounter. *Id.* at 636. Although the police did not "stop" the car, the encounter still had to pass constitutional muster. *Id.* This Court held that when the officers exited their vehicle and began to question the appellees, the interaction escalated from a "mere encounter" to an "investigative detention" requiring reasonable suspicion because a reasonable person in the appellees' position would not have felt free to turn down the officer's requests or to end the encounter. *Id.*

¶ 13 In *Commonwealth v. DeWitt,* 530 Pa. 299, 302, 608 A.2d 1030, 1031 (1992), state troopers observed a car at night parked partially on a berm and partially in a church parking lot. The officers decided to examine the vehicle and upon doing so, an occupant turned off the dome light. *Id.* at 302, 608 A.2d at 1032. The four occupants then began to make suspicious movements in the darkened vehicle. The vehicle began to drive away, whereupon the officers initiated a stop. The officers based their stop on their belief that the vehicle was disabled, that a violation of the vehicle code occurred due to the orientation of the vehicle, that a second violation of the vehicle code occurred due to the car being parked on a berm without a purpose or being disabled, and that the vehicle had trespassed onto private property. Upon approaching the vehicle, the officers observed beer, a marijuana cigarette, and a white powdery substance, which the officers believed to be narcotics. Based on these observations, the officers conducted a frisk of the occupants and discovered more contraband. The trial court suppressed all the evidence. On appeal, this Court reversed the suppression order. On further appeal, our Supreme Court reversed this Court and reinstated the suppression order. *Id.* at 306–08, 608 A.2d at 1034. Importantly, in countering the Commonwealth's allegation that a stop and investigation was justified based on the alleged parking violation, the Supreme Court held that the troopers lacked any evidence that the vehicle was parked without a purpose, and concluded that the troopers merely speculated that the car was parked illegally. *Id.* at 304–06, 608 A.2d at 1033. The Supreme Court concluded the troopers had failed to point to specific and articulable facts that formed the basis of their reasonable suspicion. *Id.* at 306, 608 A.2d at 1033. Thus, the troopers could not rely on the alleged parking violation to initiate an investigative stop. The Court specifically noted that the facts used by the officers to justify the stop of

the car and detention of its occupants failed to satisfy the grounds required for either a motor vehicle stop or a *Terry* investigatory detention. *Id.* at 306–07, 608 A.2d at 1033–34.

¶ 14 The allowable scope of an investigative detention by police differs with every set of facts. *See Commonwealth v. Dangle*, 700 A.2d 538, 540 (Pa.Super.1997), *appeal denied*, 553 Pa. 695, 718 A.2d 783 (1998). This Court has further stated that the scope of an investigative detention "[t]ypically . . . means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Commonwealth v. Douglass*, 372 Pa.Super. 227, 539 A.2d 412, 420 (1988), *appeal denied*, 520 Pa. 595, 552 A.2d 250 (1988) (emphasis added). However, the United States Supreme Court defined the permissible scope of an investigative detention when it stated:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the **least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.** It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was **sufficiently limited in scope** and duration to satisfy the conditions of an investigative seizure.

*Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229, 238 (1983) (internal citations omitted) (emphasis added).

¶ 15 In the instant case, Officer Bonkowski and his partner approached Appellant's vehicle on foot. Officer Bonkowski told Appellant to roll down his window. Officer Bonkowski repeatedly told Appellant to end his cell phone conversation. When Appellant did finally end his phone conversation, Officer Bonkowski asked Appellant if he had a driver's license. Under these circumstances, a reasonable person in Appellant's situation would not have felt free to ignore the officer's requests and simply drive off. *See DeHart, supra.* Thus, the encounter between the officers and Appellant constituted an investigative detention.[7] To effectuate this investigative detention, Officer Bonkowski needed to have reasonable suspicion that criminal activity was in progress. *Sierra, supra.*

¶ 16 Officer Bonkowski based his encounter on three events, at least one of which needed to provide reasonable suspicion to allow Officer Bonkowski to initiate a lawful investigative detention. *Id.* First, Officer Bonkowski relied on Officer Green's BOLO broadcast; second, Officer Bonkowski relied on Task Force 42's broadcast linking Appellant's vehicle to narcotics; and third, Officer Bonkowski relied upon Appellant's alleged parking violation.

¶ 17 Officer Green's belief that Appellant was an unlicensed operator of a motor vehicle and the BOLO report were based on an encounter Officer Green had had with Appellant three years prior to the instant detention. Officer Green did not check Appellant's license status until after Appellant's arrest. The motor vehicle code provides for suspensions varying anywhere from one day to a person's lifetime,

---

**7.** We note the encounter did not constitute a traffic stop as Appellant's vehicle was already stopped at the time of the interaction. *See id.*

depending on the violation.[8] Officer Green failed to reveal how he knew Appellant still had a suspended license in 1999. *See Queen, supra;* Pa.R.Crim.P. 581(H). As Officer Green failed to substantiate the basis for his BOLO report, that report cannot provide a valid basis for the investigative detention of Appellant. *Id.* To permit stops and investigative detentions based on this type of stale information would subject validly licensed drivers to unwarranted stops and investigatory detentions. *See Andersen, supra.*[9] Officer Green should have confirmed his suspicion that Appellant was not properly licensed through a license check before issuing the BOLO broadcast. If Appellant had already left the area before Officer Green could conduct the license check, the officer could have filed a citation with the proper issuing authority. *See* Pa.R.Crim.P. 410 (permitting filing of summary citation where it is not feasible to issue citation directly); *Commonwealth v. Lockridge,* 570 Pa. 510, 810 A.2d 1191 (2002).

¶ 18 Alternatively, Officer Bonkowski based his investigatory detention on the information from the Task Force 42 report that identified Appellant and his vehicle with narcotics. At the suppression hearing, the Commonwealth did not have any officers from Task Force 42 testify or produce any information providing a basis for Appellant's alleged involvement in narcotics. *See Queen, supra.* Thus, the information connecting Appellant to narcotics could not support the investigative detention. *Id.* Thus, we conclude that neither the "BOLO" broadcast nor the Task Force 42 broadcast provided the officers with proper grounds to conduct the investigative detention. Now, we must examine whether Appellant's suspected double parking violation alone provides the requisite reasonable suspicion to conduct an investigative detention. *Sierra, supra.*

¶ 19 Here, Officer Bonkowski observed a vehicle, with its engine running, stopped in the street with the driver at the wheel. Officer Bonkowski assumed Appellant was unlawfully double parked, without any examination of whether the vehicle was lawfully in place to load or unload persons or goods or otherwise engaged in activity that was being conducted legally. *See* 75 Pa. C.S.A. § 3353(a)(1)(i)(B) (stating "[s]tanding or parking for the purpose of loading or unloading persons or property may be authorized by local ordinance....") The Commonwealth did not proffer testimony to show Officer Bonkowski had reasonable suspicion to believe Appellant was unlawfully double parked. *See DeWitt, supra.* Having failed to articulate facts that gave rise to reasonable suspicion of any criminal activity by Appellant, Officer Bonkowski

---

8.  *See* 75 Pa.C.S.A. § 1538(b)(1)(iii) (providing for suspensions of fifteen days or less for points violation); 75 Pa.C.S.A. § 1532(c)(1)(i) (providing for suspension of six months for conviction involving narcotics); 75 Pa.C.S.A. § 1547(b)(1) (mandating suspension of twelve months for refusing to submit to testing after arrest for driving under influence); 75 Pa. C.S.A. § 1533(d) (providing for indefinite suspension for failure to respond to citation, summons or writ and failure to pay all fines or penalties).

9.  We recognize the standard for *Terry* stops is "reasonable suspicion" to believe criminal activity is afoot, whereas the standard for traffic stops is "probable cause" to believe a violation of the motor vehicle code has occurred. *See Commonwealth v. Gleason,* 567 Pa. 111, 785 A.2d 983 (2001); *Commonwealth v. Whitmyer,* 542 Pa. 545, 668 A.2d 1113 (1995); *Commonwealth v. Battaglia,* 802 A.2d 652 (Pa.Super.2002). Under the circumstances of the present case, a traffic stop or an investigative detention based on three-year-old or unfounded information would be equally unjustified. Either way, validly licensed drivers would be subject to unwarranted stops and/or detentions. *See Andersen, supra; Beasley, supra.*

lacked reasonable suspicion for his investigative detention. *Id.; Sierra, supra.* Thus, we conclude the trial court should have granted Appellant's motion to suppress. *See Reppert, supra.*

¶ 20 Based on the foregoing analysis, we hold where the police act on an unsubstantiated radio broadcast that a person is engaged in narcotics activity and a mere assumption that the person is currently driving under suspension, based solely upon an encounter with that person three years prior, and where the police fail to articulate grounds to support an allegation that the person is unlawfully parked, the police have failed to show the requisite reasonable basis for an investigative detention. Therefore, the investigative detention of Appellant in the instant case was unlawful, and the evidence garnered as a result of that detention should have been suppressed. Accordingly, we vacate Appellant's judgment of sentence and remand for further proceedings consistent with this opinion.

¶ 21 Judgment of sentence vacated; case remanded for further proceedings. Jurisdiction is relinquished.