J-A28012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ANTHONY THOMAS GREEN :
:
Appellant : No. 2393 EDA 2018

Appeal from the Judgment of Sentence Entered May 30, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0003259-2017

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ANTHONY THOMAS GREEN :
:
Appellant : No. 2412 EDA 2018

Appeal from the Judgment of Sentence Entered May 30, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0003256-2017

BEFORE:   PANELLA, P.J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED MARCH 11, 2020**

Appellant, Anthony Thomas Green, appeals from the judgments of

sentence entered in two separate cases on May 30, 2018, in the Court of

Common Pleas of Montgomery County.  Specifically, as to lower court docket

number CP-46-CR-0003259-2017 ("3259-2017"), Appellant was convicted at

---

[*] Former Justice specially assigned to the Superior Court.

a bench trial of possession of a firearm prohibited, firearms not to be carried without a license, two counts of possession with the intent to deliver a controlled substance, and possession of a controlled substance.[1]  Further, as to lower court docket number CP-46-CR-0003256-2017 ("3256-2017"), Appellant was convicted at a bench trial of three counts of possession with the intent to deliver a controlled substance, three counts of possession of a controlled substance, and one count of possession of drug paraphernalia.[2]  After a careful review, we affirm Appellant's judgments of sentence at both lower court docket numbers.

The relevant facts and procedural history are as follows: On April 3, 2017, the police arrested Appellant and charged him with various firearm and drug offenses.  This case was docketed in the lower court at 3259-2017.  Appellant posted bail, and on April 9, 2017, the police arrested Appellant and charged him with new drug offenses.  This case was docketed in the lower court at 3256-2017.

On July 28, 2017, Appellant filed a counseled pre-trial suppression motion at both lower court docket numbers, and on October 24, 2017, Appellant proceeded to a single suppression hearing related to both suppression motions.

---

[1] 18 Pa.C.S.A. §§ 6105 and 6106; 35 P.S. §§ 780-113(a)(30) and (a)(16), respectively.

[2] 35 P.S. §§ 780-113(a)(3), (a)(16), and (a)(32), respectively.

At the hearing, Norristown Police Detective David Crawford, who has been a law enforcement officer for over ten years, testified he was "in charge of burglary cases and sex crimes[,]" as well as part of the Montgomery County Drug Task Force. N.T., 10/24/17, at 7-8. On April 3, 2017, at 10:45 a.m., Detective Crawford, who was on routine patrol in an unmarked police vehicle, drove by Papa Guido's restaurant, located at the intersection of West Main Street and Haws Avenue, when he observed Mary Bannon, who he knew from prior police interactions, standing on the street. *Id.* at 8-9. Specifically, Detective Crawford testified he knew Ms. Bannon "from prior contact, from prostitution, and also involving heroin. She's a known heroin addict from having overdosed in Norristown, and also being involved with prostitution in that same area located—it's now called Americas Best [Value Inn], which is also within like a block of that area." *Id.* at 9.

Detective Crawford testified he parked his unmarked police vehicle and watched as Ms. Bannon approached various men, some of whom were in vehicles. *Id.* at 9-10. In this regard, he noted Ms. Bannon approached a man in a parking lot, followed him to his white pick-up truck, conversed with the man for several minutes, and then walked away. *Id.* at 10. Further, when a black SUV drove by, Ms. Bannon yelled to the driver of the SUV, and the driver circled back to where Ms. Bannon was standing; however, the SUV did not stop as Ms. Bannon was already conversing with another man. *Id.* Additionally, Detective Crawford observed as Ms. Bannon re-approached the

white pick-up truck, but she then walked away. *Id.* Detective Crawford observed as Ms. Bannon walked from Main Street to George Street, and she stood in the street at the intersection of George Street and Airy Street. *Id.* at 10-11.

Detective Crawford testified Ms. Bannon's behavior was consistent with the solicitation of clients for prostitution and/or drug purchasing; accordingly, he pulled his police vehicle away from the curb with the intent of speaking to the driver of the white pick-up truck. *Id.* at 9-11. However, at this point, he observed a blue minivan turn from Airy Street onto George Street. *Id.* at 11.

Detective Crawford testified the blue minivan came to a full stop "right in the middle of the street" in front of where Ms. Bannon was standing, and Ms. Bannon jumped into the passenger side of the minivan. *Id.* The detective continued observing the blue minivan, which travelled fifty to sixty yards and then parked alongside of the street. *Id.* Detective Crawford testified that, when the vehicle parked alongside of the street, it was not in a legal parking spot. *Id.* at 12. Specifically, he testified this portion of the street was posted with a "No Parking Here Back to Corner" sign.[3] *Id.* at 13.

Detective Crawford testified that, after the blue minivan pulled over and parked, he exited his unmarked police vehicle and approached the driver's side of the blue minivan, which had all of its windows tinted except for the

---

[3] The Commonwealth introduced into evidence photographs of the parking sign.

front windshield. *Id.* at 15. Detective Crawford indicated he could not clearly see inside of the minivan; however, he observed the driver leaning forward and moving his hands "down low." *Id.* Ms. Bannon was also still in the minivan and seated in the front passenger seat. *Id.* at 17.

For his safety, Detective Crawford, who was wearing a marked police shirt and displaying a badge, pulled out his handgun, kept it "low and ready," opened the driver's side door of the blue minivan, and identified himself as "Detective Crawford, Norristown Police Department." *Id.* at 15. Detective Crawford asked the driver, who was later identified as Appellant, to exit the blue minivan and walk to the back of the minivan. *Id.* at 15-16. Appellant complied. *Id.* at 19.

Detective Crawford testified he had no back-up officers on sight, so he patted-down Appellant for his safety; however, he did not handcuff Appellant. *Id.* Detective Crawford indicated that, as he begin talking to Appellant about his suspicions regarding Ms. Bannon, Appellant "started to become upset, a little bit hyper." *Id.* at 19-20.

At this point, two of Detective Crawford's fellow officers arrived on the scene, so Detective Crawford asked Ms. Bannon to exit the blue minivan while his fellow officers remained with Appellant. *Id.* at 20. Detective Crawford testified "[Ms.] Bannon immediately explained to me that she got in the vehicle to purchase $30 worth of heroin off of [Appellant]." *Id.* She also

informed the detective that Appellant had a handgun under the front passenger seat. *Id.* at 26.

Detective Crawford testified Appellant became more uncooperative, began screaming, refused to comply with the officers' directives that he keep his hands in view on the minivan, and began "pushing off the vehicle[.]" *Id.* at 20-21. In response, one of the detective's fellow officers, Police Officer Joshua Keenan, handcuffed Appellant. *Id.* at 21.

Detective Crawford re-approached Appellant, informed him of Ms. Bannon's statement, and asked him if he would give consent for the police to search the blue minivan. *Id.* at 23. Appellant refused to give consent and continued yelling. *Id.* at 24.

The police towed Appellant's blue minivan to the Norristown Police Station, where it was placed in a secure location. *Id.* at 25. Moreover, Ms. Bannon was transported to the police station, and she gave a written statement detailing her interactions with Appellant on April 3, 2017. *Id.* In the statement, she reiterated that Appellant had a handgun under the front passenger seat, and she clarified that, while she was sitting in the minivan, she observed "him pushing it under the driver's seat." *Id.* at 26.

Detective Crawford secured and executed a search warrant on the blue minivan on April 3, 3017. *Id.* at 28. He discovered a .40 caliber handgun under the driver's seat and three pills in the middle console. *Id.* at 28-29.

Police Officer Joshua Keenan testified that, on April 3 2017, he responded to Detective Crawford's request for back-up officers. *Id.* at 70. When he arrived on the scene, Appellant was standing at the back of the blue minivan with the detective; Appellant was "very irate." *Id.*

Officer Keenan confirmed Appellant was screaming, refused to keep his hands on the minivan, and "push[ed] off of the vehicle." *Id.* at 71. Concluding Appellant was going to run or become a danger to himself or the officers, Officer Keenan handcuffed Appellant. *Id.*

Officer Keenan testified that, due to Appellant's demeanor and behavior, he decided to place Appellant in the back of the police vehicle for the safety of Appellant and the officers. *Id.* at 73-74. He also hoped it would de-escalate the situation with regard to Appellant's irate behavior. *Id.* at 80.

Accordingly, prior to placing Appellant in the back of the police vehicle, Officer Keenan patted-down Appellant. *Id.* at 72. Officer Keenan testified that, as he began "patting down the area of [Appellant's] left jacket pocket, [Appellant] continued to scream. [Since] the jacket pocket was loose, [the officer] could see there was a large amount of bundled heroin bags inside[.]" *Id.*

Officer Kennan seized the bundle, which contained yellow bags of methamphetamine, as well as twist-tied baggies of heroin. *Id.* at 74. Appellant was arrested and transported to the Norristown Police Station. *Id.*

At the police station, the officers discovered $317.00 of cash, as well as a cell phone, on Appellant's person. *Id.*

Additionally, Officer Keenan testified that, on April 8, 2017, he was on patrol in a high crime area in an unmarked police vehicle when he made contact with a confidential informant who had provided reliable information to the officer in the past.[4] *Id.* at 87, 101. Officer Keenan indicated:

> [The] confidential informant told [him] that he had purchased $40 worth of narcotics from a male he knew as Ant. He stated that he purchased two bags of methamphetamine and two bags of heroin.
>
> ***
>
> He described [Ant] as a younger black male. I asked what he drove. He said he used to have a blue van. And he said that the van was recently seized when he was arrested…[i]n Norristown.
>
> ***
>
> He stated that [the blue minivan] had been seized a few days before and that because [Ant] didn't have that van, he was now driving a blue Subaru.

*Id.* at 88.

The confidential informant advised Officer Keenan that he had purchased the $40.00 worth of drugs from "Ant" at the Americas Best Value Inn in Norristown just before meeting with the officer. *Id.* at 90. The

---

[4] Officer Keenan testified the confidential informant provided information in February of 2017 that "directly led to the apprehension of a violent fugitive." *Id.* at 87, 98. Specifically, the confidential informant contacted Officer Keenan and told him a known violent fugitive was staying at a certain house in Norristown. *Id.* at 102-03. The officer conducted surveillance on the residence and arrested the violent fugitive. *Id.* at 103.

confidential informant gave the officer some of the methamphetamine and heroin as proof that he had just purchased it. *Id.*

Officer Keenan testified that, prior to April 3, 2017, he was aware that a person known as "Ant" was dealing drugs in Norristown; however, he became aware of the fact that "Ant" was actually Appellant on April 3, 2017, when Appellant was arrested. *Id.* at 89. Thus, when the confidential informant provided the information to Officer Keenan on April 8, 2017, he believed the confidential informant was referring to Appellant. *Id.*

However, believing Appellant was in prison in connection with the April 3, 2017, incident, Officer Keenan testified he asked the confidential informant how it was possible that he had just purchased a controlled substance from Appellant since Appellant was incarcerated. *Id.* The confidential informant advised Officer Keenan that, although the police had "Ant's" minivan, "Ant" was out of jail on bail. *Id.*

In addition, the confidential informant told the officer that "Ant" would be returning to the Americas Best Value Inn in approximately fifteen to twenty minutes. *Id.* at 90-91. Accordingly, Officer Keenan, who was sitting in his unmarked police vehicle on the 200 block of Knox Street, set up surveillance to watch the Americas Best Value Inn. *Id.* at 91.

Soon thereafter, the officer "observed a blue Subaru Outback traveling south on Stanbridge Street." *Id.* The officer maneuvered so that he was

behind the Subaru and ran the license plate number. *Id.* The vehicle was registered to Appellant. *Id.*

At this point, Officer Keenan initiated a stop of the Subaru, and when he approached the Subaru, Appellant was in the driver's seat. *Id.* at 92, 94. Appellant was "immediately confrontational, tried to reach towards the center console, refused to keep his hands visible, and was irate and screaming." *Id.* Officer Keenan asked Appellant to exit the vehicle, and Appellant refused. *Id.* Accordingly, the officer "pulled him out of the vehicle" and placed Appellant, who continued being combative, in handcuffs. *Id.*

Officer Keenan testified he patted-down Appellant for the officer's safety. *Id.* at 93. Officer Keenan explained that he used just the "inside" of his hands to pat-down "the outline of [Appellant's] body." *Id.* at 115. He testified Appellant "was extremely animated as [the officer] was patting him down." *Id.* at 93. As the officer patted down the right side of Appellant's body and tried to hold him still, Appellant "tried to turn away from [the officer]." *Id.*

As Officer Keenan felt the outside of a small pocket located above the main pocket of Appellant's jeans, he "could feel the outline of a small ziplock bag filled with what was immediately apparent to [the officer] as a rocklike substance consistent with crack cocaine." *Id.* at 93, 115. Officer Keenan specifically testified that, based on his experience in law enforcement, "this packaging [was] consistent with how crack cocaine is packaged." *Id.* at 93-

94. Officer Keenan testified he reached into the pocket and retrieved a small ziplock bag containing crack cocaine. *Id.* at 94.

At this point, Appellant was arrested, and the Subaru was towed to the Norristown Police Department's secure evidence bay. *Id.* Officer Keegan secured a search warrant for the Subaru, and upon execution of the warrant, the officer discovered, in the dashboard of the driver's seat area, 126 small ziplock bags containing crack cocaine, 14 small ziplock bags containing powder cocaine, 11 small ziplock bags containing crystal methamphetamine, and 35 ziplock bags containing suspected heroin. *Id.* at 96-97. The officer also found numerous black and green rubber bands, a sandwich bag containing an unknown white substance, a pill bottle containing two capsules of amoxicillin, four cellular phones, a wallet, and the vehicle registration. *Id.* at 97. Further, Appellant's person was searched incident to his arrest, and the police discovered $1,402.00 on his person. *Id.*

At the conclusion of all testimony, the suppression court denied Appellant's motion to suppress in both cases,[5] and on March 27, 2018, following a bench trial, the trial court convicted Appellant of the offenses listed above in each case. On May 30, 2018, Appellant proceeded to a sentencing

---

[5] The suppression court filed an order in which it provided the court's detailed factual findings from the suppression hearing. *See* Suppression Court Order, filed 12/12/17.

hearing as to both cases, and he was sentenced to an aggregate of 10½ years to 40 years in prison.

On June 7, 2018, Appellant filed a timely, counseled post-sentence motion in both cases, which the trial court denied on July 13, 2018. On August 13, 2018, Appellant filed a separate notice of appeal at each lower court docket number.[6]

On August 16, 2018, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement in both cases; however on August 23, 2018, Appellant's trial counsel filed a petition seeking to withdraw his representation. On August 27, 2018, the trial court granted counsel's petition, and thereafter, new counsel entered his appearance on behalf of Appellant.

New counsel filed a petition in the trial court seeking an extension of time to file a Pa.R.A.P. 1925(b) statement; however, the trial court filed an opinion on October 15, 2018, deeming all issues to be waived under Pa.R.A.P. 1925(b) in both cases. Accordingly, on October 23, 2018, new counsel filed in this Court a motion for remand to file a Rule 1925(b) statement in both cases, and on November 21, 2018, we granted the motion and remanded for the appropriate filing of Rule 1925(b) statements.

---

[6] We note each notice of appeal included a corresponding single lower court docket number, and therefore, the notices of appeal comply with the dictates of **Commonwealth v. Walker**, 646 Pa. 456, 185 A.3d 969 (2018).

On December 3, 2018, Appellant filed a timely Rule 1925(b) statement, which was docketed in both cases, and the trial court filed a Rule 1925(a) opinion.[7] This Court *sua sponte* consolidated Appellant's two separate notices of appeal on January 29, 2019.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Presented" (verbatim):

1. Whether the trial court erred and abused its discretion in case 3259-2017 by denying Appellant's motion to suppress physical evidence recovered from [Appellant's] person and motor vehicle as a result of an unlawful stop, seizure, and/or investigative detention of Appellant all of which rendered the application for the search warrant lacking probable cause?

2. Whether the trial court erred and abused its discretion in case 3256-2017 by denying Appellant's motion to suppress physical evidence recovered from [Appellant's] person and motor vehicle as a result of an unlawful stop, seizure, and/or investigative detention of Appellant all of which rendered the application for the search warrant lacking probable cause?

Appellant's Brief at 2.

Appellant's issues challenge the lower court's order, which denied his motions to suppress the physical evidence seized by the police. We review such claims using the following standard and scope of review.

> Our standard of review…is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when

---

[7] The trial court's Rule 1925(a) opinion, which incorporated its factual findings from the prior suppression order, provided a detailed analysis of Appellant's suppression issues discussed *infra*.

read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Galendez*, 27 A.3d 1042, 1045 (Pa.Super. 2011) (*en banc*) (citation omitted).

Additionally, "[a]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 A.3d 1278, 1281–82 (Pa.Super. 2017) (citation omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Id.* at 1282 (citation omitted).

In his first issue, which relates to Appellant's conviction at 3259-2017 for his offenses committed on April 3, 2017, Appellant contends he was subject to an illegal investigative detention when Detective Crawford opened the driver's side door of his parked minivan without having the requisite reasonable suspicion.

There are three types of interactions between police and the citizenry. *See generally Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super. 2000).

> Interaction between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained. Such interaction may be classified as a "mere encounter," an "investigative detention," or a "custodial detention." A "mere encounter" can be any formal or informal interaction between an officer and a citizen, but will

normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

In contrast, an "investigative detention," by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires "reasonable suspicion" of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Commonwealth v. Stevenson*, 832 A.2d 1123, 1127 (Pa.Super. 2003) (citation omitted).

Instantly, the lower court determined that, when Detective Crawford approached Appellant's parked minivan and opened the driver's side door, Appellant was subject to an investigative detention for which reasonable suspicion was needed.

To determine if an interaction rises to the level of an investigative detention, *i.e.,* a *Terry*[8] stop, the court must examine all the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders. An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution.

*Stevenson*, 832 A.2d at 1127 (citations omitted) (footnote added).

_____

[8] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968).

- 15 -

In the case *sub judice*, it is undisputed that Detective Crawford approached Appellant's parked minivan on foot, opened the driver's side door with his handgun "low and ready," identified himself as a police officer, and asked Appellant to exit the minivan. Under these circumstances, we agree with the suppression court that a reasonable person in Appellant's situation would not have felt free to ignore the detective's requests and simply drive off. Thus, the initial encounter between the detective and Appellant constituted an investigative detention.[9] ***See Stevenson***, ***supra*** (holding an investigative detention occurred where the police officer approached the appellant's parked vehicle on foot, told the appellant to roll down the window, repeatedly told the appellant to end his telephone conversation, and asked the appellant if he had a driver's license).[10]

_____

[9] We note the police encounter did not constitute a "traffic stop" since Appellant's vehicle was already parked when Detective Crawford made his initial encounter with Appellant. ***See Stevenson***, ***supra***; ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa.Super. 2000). "[However,] [a]lthough the police did not 'stop' the car, the encounter still had to pass constitutional muster." ***Stevenson***, 832 A.2d at 1129 (citation omitted).

[10] Appellant suggests that, since Detective Crawford approached the vehicle with his gun "low and ready," the initial encounter constituted a "custodial detention," as opposed to an "investigative detention." ***See*** Appellant's Brief at 24-27. We disagree. "Our law enforcement officers are not required to take any more risks than those already inherent in stopping a drug suspect, particularly one in an automobile." ***Commonwealth v. Johnson***, 849 A.2d 1236, 1239 (Pa.Super. 2004). "Likewise, it cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop...." ***Commonwealth v. Dennis***, 433 A.2d 79, 80 n.5 (Pa.Super.

Next, we examine the lower court's holding that Detective Crawford had reasonable suspicion to institute the investigative detention. *Commonwealth v. Chambers*, 55 A.3d 1208, 1215 (Pa.Super. 2012) ("To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot."). "Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate." *Id.* (quotation marks and quotation omitted).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Id.* (citation omitted).

Whether reasonable suspicion exists at the time of an investigatory detention must be determined by examining the totality of the circumstances, "including such factors as tips, the reliability of the informant, time, location, and suspicious activity, including flight." *Commonwealth v. Smith*, 172

_____

1981). *See Commonwealth v. Dix*, 207 A.3d 383 (Pa.Super. 2019) (holding police stop was an investigative detention, as opposed to a custodial detention, when police approached the defendant with their guns drawn and forced him to place his hands on the roof of his truck; only two officers approached the defendant).

A.3d 26, 33 (Pa.Super. 2017) (quotation marks, quotation, and citation omitted). Further, a defendant's presence in a high crime area supports the existence of reasonable suspicion. **See Commonwealth v. Foglia**, 979 A.2d 357, 361 (Pa.Super. 2009) (*en banc*). "In assessing the totality of the circumstances, courts must also…acknowledge that innocent facts, when considered collectively, may permit the investigative detention." **Commonwealth v. Walls**, 206 A.3d 537, 541-42 (Pa.Super. 2019) (citations omitted).

In the case *sub judice*, as the lower court determined, Detective Crawford is a "veteran police officer with over ten years of experience with the Norristown Police Department and has extensive training, knowledge and experience with such criminal acts as prostitution and controlled substance offenses." Trial Court Opinion, filed 12/26/18, at 12. Further, Detective Crawford was well acquainted with Mary Bannon prior to April 3, 2018, and he knew she was involved in prostitution and drug activity. **See** Suppression Court Order, filed 12/12/17.[11]

On April 3, 2018, Detective Crawford, while on routine patrol, observed Ms. Bannon on the street in a high crime area. He indicated she had been involved in prostitution at the Americas Best Value Inn, which was just a block from where he first observed Ms. Bannon. **Id.**

---

[11] The suppression court's order is not paginated.

In his unmarked police vehicle, he conducted surveillance and watched as she approached, called out to, and spoke to different men. *See id.* He then observed as she walked to a nearby intersection at George and Airy Streets. *Id.* Detective Crawford testified Ms. Bannon's actions were consistent with the solicitation of clients for prostitution and/or drug activity. *Id.*

As Ms. Bannon stood at the intersection, Appellant's minivan turned onto George Street, and it suddenly came to a full stop "right in the middle of the street" in front of where Ms. Bannon was standing. *Id.* Ms. Bannon immediately entered the passenger side of the vehicle. *Id.* This was indicative of a pre-planned meeting between Ms. Bannon and Appellant. *Id.*

"The blue minivan moved about fifty (50) to sixty (60) yards down the block before pulling over and illegally parking, which through the Detective's training and experience, was consistent with a drug transaction." *Id.* (citation to transcript omitted). The detective approached the minivan and observed Appellant was "leaning forward and moving his hands down low in his lap area, but [the detective] could not see what his hands were doing specifically. Any further observations were limited due to the vehicle's tinted windows." *Id.* (citation to transcript omitted). Based on Appellant's movements, it was reasonable for the Detective to believe that Appellant could have been reaching for a weapon. As a result, Detective Crawford, for officer safety, opened the driver's side door and asked Appellant to exit his vehicle.

Based on the totality of the circumstances, we agree with the lower court that Detective Crawford articulated specific observations, which in conjunction with all reasonable inferences derived therefrom, led him to reasonably conclude that criminal activity was afoot. **See Chambers**, **supra**. Thus, we agree with the suppression court that Detective Crawford had the necessary reasonable suspicion to support the initial investigative detention, and accordingly, Appellant's first claim is meritless.[12]

In his next issue, which relates to Appellant's conviction at 3256-2017 for his offenses committed on April 9, 2017, Appellant contends Officer Keenan did not have the requisite reasonable suspicion to stop his blue Subaru.

Initially, with regard to vehicle stops, we recognize the following:

"Traffic stops based on a reasonable suspicion: either of criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b) must serve a stated investigatory purpose." **Commonwealth v. Feczko**, 10 A.3d 1285, 1291 (Pa.Super. 2010) (*en banc*) (citation omitted). For a stop based on the observed violation of the Vehicle Code or otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop. **Feczko**, 10 A.3d at 1291 ("Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation.").

---

[12] Appellant avers that, "[a]fter redacting the evidence derived from Appellant's unlawful stop…and excising those averments in the affidavit alleging drug trafficking by Appellant, the affidavit lacks probable cause to support the [search] warrant [of Appellant's minivan]." Appellant's Brief at 28-29. However, inasmuch as we conclude Detective Crawford had a reasonable suspicion to conduct the initial investigative detention, we find this averment to be meritless.

*Commonwealth v. Harris*, 176 A.3d 1009, 1019 (Pa.Super. 2017).

In the case *sub judice*, as the lower court held, Officer Keenan stopped Appellant's blue Subaru on April 9, 2017, in order to investigate suspected drug activity (as opposed to stopping the Subaru for an observed Vehicle Code violation or otherwise non-investigable offense). ***See*** Suppression Court Order, filed 12/12/17. Thus, Officer Keenan needed reasonable suspicion that criminal activity was afoot before stopping Appellant's Subaru. ***See Chambers***, ***supra***.

A wide variety of circumstances may give rise to a reasonable suspicion to conduct an investigative detention for suspected drug activity. Information provided by a confidential informant or a "tipster" can help establish reasonable suspicion for an investigative detention. ***See Commonwealth v. Ranson***, 103 A.3d 73, 78–79 (Pa.Super. 2014) (holding tip from nightclub patron while police officer was working security detail at club in high-crime area, identifying the defendant and stating that he was carrying firearm, was legitimate factor upon which officer could rely in determining that reasonable suspicion existed to stop the defendant even though officer did not know the informant's name).

Here, we conclude reasonable suspicion existed for Officer Keenan to stop Appellant's blue Subaru. Specifically, Officer Keenan, who was on duty, came in contact with a confidential informant, who had proven reliable in the

past. *See* Trial Court Opinion, filed 12/26/18, at 19; *See* Suppression Court Order, filed 12/12/17.

The confidential informant explained that he had just purchased $40.00 worth of drugs from "Ant" at the Americas Best Value Inn, which is in a high crime area, and he showed some of the drugs to the officer. The confidential informant described "Ant" as a younger black male, knew that "Ant" had been arrested, knew that "Ant's" blue minivan had been seized, knew "Ant" was out of jail on bail," and knew that "Ant" was now driving a blue Subaru. *See* Suppression Court Order, filed 12/12/17. From his prior experience with Appellant, Officer Keenan knew that "Ant" was actually Appellant.[13] *See id.*

The confidential informant told the officer that, within the next fifteen to twenty minutes, "Ant" would be returning to the Americas Best Value Inn in his blue Subaru. *See id.* Officer Keenan conducted surveillance, saw a blue Subaru approach the area, ran the Subaru's license plate number, and confirmed the Subaru was registered to Appellant. *See id.*

Based on the totality of the circumstances, including the confidential informant's information and Officer Keenan's independent corroboration thereof, Officer Keenan had reasonable suspicion to believe that Appellant was involved in drug activity on April 8, 2017. *See Johnson*, 849 A.2d at 1238

---

[13] Additionally, Officer Keenan was undisputedly involved with the investigatory stop and arrest of Appellant on April 3, 2017, and accordingly, he was aware that controlled substances were seized from Appellant on that day.

("We…conclude that based on the information given by a C.I. who had proven to be reliable in the past, when a man fitting the description arrived at the appointed location in a car similar to the one that had been described by the C.I., the police had reasonable suspicion that criminal activity was afoot."). Accordingly, the officer properly stopped Appellant's Subaru to investigate suspected drug activity.

Appellant next suggests that, assuming, *arguendo*, Officer Keenan was permitted to conduct a ***Terry*** frisk for weapons after stopping Appellant's Subaru, the officer exceeded the scope of the permissible search by illegally reaching into Appellant's small jean pocket to remove the small ziplock bag of crack cocaine. We find no merit to this claim and agree with the lower court that Officer Keenan justifiably put his hand into Appellant's small pocket under the "plain feel doctrine."

Under the plain feel doctrine,

> a police officer may seize non-threatening contraband detected through the officer's sense of touch during a ***Terry*** frisk if the officer is lawfully in a position to detect the presence of contraband, the incriminating nature of the contraband is immediately apparent from its tactile impression and the officer has a lawful right of access to the object. [T]he plain feel doctrine is only applicable where the officer conducting the frisk feels an object whose mass or contour makes its criminal character immediately apparent. Immediately apparent means that the officer readily perceives, without further exploration or searching, that what he is feeling is contraband. If, after feeling the object, the officer lacks probable cause to believe that the object is contraband without conducting some further search, the immediately apparent requirement has not been met and the plain feel doctrine cannot justify the seizure of the object.

*Commonwealth v. Pakacki*, 587 Pa. 511, 521, 901 A.2d 983, 989 (2006)

(citation and quotation omitted).

In the case *sub judice*, the lower court relevantly indicated the following:

When Officer Keenan approached Appellant's [Subaru], [Appellant] was moving his hands about and screaming, and he did not comply with the officer's requests to keep his hands visible. Because of [Appellant's] defiant demeanor, and knowing he [had] carried firearms in the past, Officer Keenan removed Appellant from [the Subaru]…and patted him down for weapons[.]

During the pat-down, [which the officer did with the inside of his hands to feel the outline of Appellant's body,] Appellant continued to be uncooperative with the Officer and repeatedly turned away from him, making the pat-down difficult and requiring Officer Keenan to direct him to stand still a number of times. While patting Appellant down, Officer Keenan felt, in the [small] pocket of [Appellant's] pants, a ziploc[k] bag with a raised plastic seal containing a rocklike substance, which was immediately apparent to the Officer as being [crack] cocaine. There is no indication that the pat-down was anything more than just that.

Trial Court Opinion, filed 12/26/18, at 19 (citations to record omitted). *See* Suppression Court Order, filed 12/12/17.

We conclude the suppression court's factual findings are supported by the record, and we agree with the court's sound reasoning. Simply put, during the lawful pat-down, the officer felt an object which he knew from his experience in law enforcement to be crack cocaine packaged in a ziplock bag. Under the totality of the circumstances, the incriminating nature of the crack cocaine was immediately apparent to Officer Keenan, who had a lawful right of access to it. Based on these facts, the suppression court properly found no

merit to Appellant's suppression issue with regard to the plain feel doctrine.[14]

***See Pakacki***, ***supra***.

For all of the foregoing reasons, we find no merit to the suppression issues presented by Appellant with regard to his cases docketed in the lower court at 3259-2017 and 3256-2107. Accordingly, we affirm both judgments of sentence.

Judgments of Sentence Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/11/20

---

[14] Appellant contends that, after redacting the evidence derived from Appellant's unlawful stop and Officer Keenan's unlawful seizure of the crack cocaine from Appellant's pocket on April 9, 2017, the affidavit for the search warrant of Appellant's Subaru lacks probable cause. ***See*** Appellant's Brief at 44-46. However, inasmuch as we conclude Officer Keenan had the necessary reasonable suspicion to stop the Subaru, as well as properly seized the crack cocaine from Appellant's small jean pocket, we find this averment to be meritless.